**Below is an Opinion of the Court.**

U.S. BANKRUPTCY COURT
DISTRICT OF OREGON
**F I L E D**
**January 04, 2008**
**Clerk, U.S. Bankruptcy Court**

_____
ELIZABETH PERRIS
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In Re: | Bankruptcy Case No. 07-31112-elp7 |
| JAMIE LYNN TREON, | |
| Debtor. | Adversary No. 07-03159 |
| A.K.D., INC., dba HOME INSTEAD SENIOR CARE OF OREGON | MEMORANDUM OPINION |
| Plaintiff, | |
| v. | |
| JAMIE LYNN TREON, | |
| Defendant. | |

Plaintiff, Home Instead Senior Care of Oregon (Home Instead), filed this adversary proceeding to have its claim against defendant-debtor, Jamie Treon, declared nondischargeable and reduced to judgment. The claim arises from alleged breaches of employment agreements containing non-compete and non-solicitation provisions. For the reasons discussed below, I conclude that, when debtor went to work for one of Home Instead's former clients one month after she stopped working for Home Instead, she did not willfully and maliciously injure Home Instead.

Page 1 - MEMORANDUM OPINION

Thus, Home Instead's claim that the debt debtor owes it is nondischargeable under 11 U.S.C. § 523(a)(6)[1] will be dismissed.

FACTS

Home Instead, which runs a service that provides primarily non-medical in-home care to seniors, employed debtor as a caregiver from about June 14, 2005, until she resigned on April 28, 2006. As a condition of her employment, debtor signed two contacts with Home Instead - a "Caregiver Confidentiality, Non-Solicitation and Non-Compete Agreement" (Non-Compete Agreement) and an "Employment Agreement." Those agreements together prohibited debtor from soliciting, diverting, taking away, or attempting to solicit, divert, or take away, any of Home Instead's current or prospective clients and from working for any of Home Instead's clients for three months after termination of employment.

While employed by Home Instead, debtor provided services primarily for Richard Mayfield and Donald and Phyllis Hinman (the Hinmans).

During one of her last visits with Mayfield, debtor informed him and Susan Lewis (who was Mayfield's medical decision maker and power of attorney) that she was resigning from Home Instead. Debtor testified that, after she told Mayfield and Lewis that she was leaving Home Instead, Lewis suggested that debtor continue working for Mayfield as a private caregiver after she quit. Lewis testified that debtor was the one who made the suggestion. I believe Lewis's version and find that debtor was the one who made the suggestion, based on Lewis's demeanor and the fact that Lewis has no stake in this proceeding.

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

Page 2 - MEMORANDUM OPINION

As a result of the conversation with debtor, Lewis contacted Home Instead on or about April 26, 2006, to cancel Mayfield's service contract. That day Matt Van Sooy, a Home Instead employee, contacted Lewis and warned her that it would be a breach of Mayfield's service contract if she independently hired debtor.[2] A few hours after that conversation, Lewis reinstated Mayfield's contract with Home Instead. There was no break in the services Home Instead provided to Mayfield.

As for the Hinmans, debtor denies making a similar proposal to provide post-termination services to the Hinmans. Home Instead did not provide any direct evidence that debtor solicited the Hinmans as clients, but wants me to infer that she did based on the fact that debtor did solicit Mayfield and that, on April 26, 2006, the Hinmans also called Home Instead to cancel their contract. Kelly Davison, Home Instead's co-owner, and Jeannette Barlow, Home Instead's registered nurse, went to the Hinmans' home and informed Hinman of the restrictions in his contract with respect to hiring former Home Instead employees. Matt Van Sooy also called Rick Hinman (the Hinmans' son) to tell him about the contract restrictions. On May 2, the Hinmans reinstated their contract.

Ali Davidson, another co-owner of Home Instead, was suspicious that debtor was attempting to solicit Home Instead clients. When debtor picked up her final paycheck, Ali Davidson warned debtor that she could

---

[2] There was testimony that Home Instead clients sign a contract agreeing that, if the client chooses to stop receiving services from Home Instead, the client must wait for one year before independently hiring a former employee of Home Instead. None of the written contracts between Home Instead and its clients were introduced in evidence. Nor was there any evidence that debtor was aware of this provision in the clients' contracts with Home Instead.

Page 3 - MEMORANDUM OPINION

not continue working for Home Instead clients under the terms of her Non-Compete Contract and Employment Agreement. Debtor told Davidson that she had intended to continue styling Mrs. Hinman's hair and was contemplating having her husband mow the Hinmans' lawn. Davidson told debtor that she could not provide those services, and was to have no contact with Mayfield or the Hinmans.

In the weeks after she left Home Instead, debtor requested and received copies of her Non-Compete and Employment Agreements. She sought the advice of counsel to clarify her rights and obligations under the contracts. After speaking with her lawyer, debtor understood that she could not solicit, divert, or take away any of Home Instead's *current* clients, but that she could work for *former* clients.

I find credible debtor's testimony regarding the legal advice she received and her understanding of that advice. Debtor's testimony was corroborated by Roxanne Farra, Home Instead's attorney in the state court case it had filed against defendant prior to her bankruptcy. Farra testified that debtor's counsel had filed a motion for summary judgment in state court on the theory that debtor had not breached the contracts, because the contract language did not extend to "former" clients of Home Instead. Although the state court judge denied debtor's motion, the theory used in the motion corroborates debtor's testimony regarding the advice she received from counsel as to what the contracts required.

From April 28, 2006, her last day of work for Home Instead, to June 2, 2006, debtor had no working relationship with any current or former Home Instead clients, nor did she attempt to or actually solicit, divert, or take away any clients. During May, the Hinmans continued to receive

Page 4 - MEMORANDUM OPINION

services from Home Instead. On May 31, Rick Hinman called Home Instead and once again canceled his parents' service contract. On June 1, Rick Hinman contacted debtor and offered her employment as one of his parents' private caregivers. The Hinmans had been using the services of at least one private caregiver before they hired the debtor. Following her attorney's advice, debtor confirmed with Rick Hinman that the Hinmans were no longer clients of Home Instead. Satisfied with Rick Hinman's answers, debtor started providing care for the Hinmans on June 2, 2006.

Soon after, Home Instead discovered that debtor was working for the Hinmans. Home Instead sued debtor in state court for breach of the non-compete provisions in the contracts and sought an injunction to stop debtor from working for the Hinmans. The state court denied the injunction request. Before the trial was held in state court on the breach of contract claim, debtor filed for bankruptcy.

ISSUE

Whether debtor willfully and maliciously injured Home Instead by working for Home Instead's former clients within three months of terminating her employment with Home Instead.

DISCUSSION

Bankruptcy Code § 523(a)(6) excepts from discharge debts resulting from "willful and malicious injury by the debtor to another entity or to the property of another entity." The plaintiff has the burden of proving every element of the claim by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 290 (1991); In re Gee, 173 B.R. 189, 191 (9th Cir. BAP 1994).

Section 523(a)(6) traditionally applies to intentional torts.

Page 5 - MEMORANDUM OPINION

Kawaauhau v. Geiger, 523 U.S. 57, 61-62 (1998) (indicating that negligent and reckless torts and intentional breaches of contract are outside the scope of what was "plainly expressed" in § 523(a)(6)).  "It is well settled that a simple breach of contract is not the type of injury addressed by § 523(a)(6)."  In re Riso, 978 F.2d 1151, 1154 (9th Cir. 2001).  An intentional breach of contract is excepted from discharge only if it is "accompanied by tortious conduct which results in willful and malicious injury."  In re Jercich, 238 F.3d 1202, 1205 (9th Cir. 2001).

Under Jercich, the first question in determining whether a breach of contract is excepted from discharge under § 523(a)(6) is whether debtor's conduct was tortious.  238 F.3d at 1206.  The second question is whether the debtor's conduct resulted in willful and malicious injury to the Home Instead.  Both requirements must be met before a debt arising from conduct that also constitutes breach of a contract will be nondischargeable under § 523(a)(6).  Id. at 1205,1206-1209 (analyzing each element separately).

For the reasons discussed below, I find that debtor's conduct was not tortious and did not give rise to a willful or malicious injury. Thus, Home Instead's nondischargeability claim fails.

1. <u>Tortious Conduct</u>:

   (a)  <u>Must Home Instead prove an intentional tort?</u>

Home Instead argues that debtor's conduct constituted intentional interference with economic relations, which is a tort.  However, Home Instead also argues that it need not prove that defendant's conduct constituted a tort, but instead must prove only that debtor's conduct was something akin to a tort or tort-like.  I reject that argument.

Page 6 - MEMORANDUM OPINION

The law is clear in the Ninth Circuit that a debt arising from a breach of contract is nondischargeable under § 523(a)(6) only to the extent that the breach of contract was accompanied by willful and malicious tortious conduct. Riso, 978 F.2d at 1154; Jercich, 238 F.3d at 1205. See also In re Hayes, 315 B.R. 579, 590 (Bankr. C.D. Cal. 2004). As the Ninth Circuit recently said:

> In 1998, . . . the Supreme Court clarified that the § 523(a)(6) exception "is confined to debts 'based on what the law has for generations called an intentional tort.'" Geiger, 523 U.S. at 60 (quoting Geiger v. Kawaauhau (In re Geiger), 113 F.3d 848, 852 (8th Cir. 1997)(en banc)).

In re Ditto, 2007 WL 4355367 *3 (9th Cir. 2007).

Despite that clear statement of the law, Home Instead argues that a breach of a non-compete contract results in a nondischargeable debt regardless of whether tortious conduct is involved, relying on In re Trammell, 172 B.R. 41 (Bankr. W.D. Ark. 1994), which was cited in Jercich. In Trammell, the court made no finding regarding whether the defendant's conduct was tortious. It merely concluded that, under the facts of that case, the breach of a covenant not to compete was willful and malicious. The Jercich court cited Trammell as an example of a case in which an intentional breach of contract had resulted in willful and malicious injury. It did not cite Trammell as a way of softening the requirement that there be an intentional tort in order for damages for breach of contract to be nondischargeable under § 523(a)(6). In any event, the defendant's conduct in Trammell would have constituted tortious conduct, and therefore Trammell is consistent with Jercich.

Plaintiff also relies on In re Ketaner, 149 B.R. 395 (Bankr. E.D. Va. 1992). In that case, the defendant had sold his stock in a large

Page 7 - MEMORANDUM OPINION

company for $1,200,000, but remained the president and chief executive officer. 149 B.R. at 396. After having a dispute with the company over his annual bonus, the defendant decided to form his own company with the goal of destroying his prior employer's business. Id. at 398. He successfully enticed the plaintiff's staff to quit their jobs and come and work for his new company. The defendant tortiously interfered with the plaintiff's contractual and business relations, conspired to injure the plaintiff in violation of Virginia's criminal code, breached his fiduciary duty as an officer of the plaintiff's corporation, and breached a non-compete agreement. Id. Thus Ketaner does not support plaintiff's argument that any breach of a covenant not to compete, even on that is not tortious, is sufficient to establish nondischargeability under § 523(a)(6).

    (b)  Was debtor's conduct tortious?

In determining whether debtor's conduct was tortious, the court must apply Oregon state law, because the contracts and conduct at issue occurred in Oregon. Jercich, 238 F.3d at 1206. To prove intentional interference with economic relations, the tort plaintiff cliams defendant committed, the plaintiff must establish

> (1) the existence of a valid business relationship or expectancy, (2) intentional interference with that relationship, (3) by [the defendant], (4) accomplished through improper means or for an improper purpose, (5) a casual effect between the interference and damage to economic relations, and (6) damages.

Uptown Heights Assoc. v. Seafirst Corp., 320 Or. 638, 651 (1995).

The heart of this nondischargeability claim is Home Instead's assertion that defendant intentionally interfered with its economic

Page 8 - MEMORANDUM OPINION

relations with the Hinmans.[3] I conclude that Home Instead failed to prove the elements of intentional interference with economic relations with the Hinmans.

First, Home Instead failed to establish that it had a valid business relationship with the Hinmans when debtor started working for them in June 2006. Rick Hinman had canceled his parent's contract with Home Instead on May 31, 2006. He then contacted debtor on June 1 and offered her employment as an independent caregiver for his parents. Debtor accepted his offer and started working for the Hinmans on June 2. Because the Hinmans had terminated their business relationship with Home Instead before the Hinmans approached debtor or debtor accepted employment from Rick Hinman, there was no valid business relationship between Home Instead and the Hinmans when debtor went to work for them. As I said earlier, there is no evidence that debtor knew of the provision in the contract between Home Instead and the Hinmans that prevented them

---

[3] A significant amount of trial time was spent discussing the fact that Mayfield and the Hinmans gave notice that they were terminating their use of Home Instead services contemporaneously with debtor's leaving her employment at Home Instead. The evidence established that debtor had sought to draw Mayfield away from Home Instead while he was still a client of Home Instead, but Mayfield did not in fact terminate his agreement with Home Instead, and debtor never provided private caregiver services to him after she left her employment with Home Instead. Therefore, there was in fact no interference with the Home Instead contract with Mayfield, and no damages arising from debtor's solicitation of Mayfield as a client. I agree with plaintiff that it is reasonable to infer that defendant also solicited the Hinmans in April just before she left her employment. That solicitation, however, did not cause the Hinman's to terminate their services and thus did not damage plaintiff. As discussed hereafter, I do not believe that debtor solicited the Hinmans while they were still clients of Home Instead in connection with subsequent employment by them a month later.

Page 9 - MEMORANDUM OPINION

from hiring a private caregiver after they had terminated their agreement with Home Instead.

Second, even if Home Instead had a business relationship with the Hinmans, Home Instead did not prove that debtor interfered with that relationship. Home Instead did not prove that debtor approached the Hinmans, or suggested that they cancel their contract and hire her as an independent caregiver in late May or early June 2006. Home Instead would have me infer that debtor did solicit the Hinmans from the fact that debtor solicited Mayfield while he was still a client of Home Instead, and that both Mayfield and the Hinmans gave notice of termination to Home Instead on the same date, April 26, 2006. While I agree that it is fair to infer that debtor solicited the Hinmans in late April, the Hinmans quickly rescinded their termination continued using Home Instead's services for an additional month. I decline to infer that debtor further solicited the Hinmans in early June from those facts. The Hinmans had previously hired at least one other independent caregiver not employed by Home Instead. This suggests that the Hinmans needed no encouragement from debtor to cancel their contract with Home Instead and hire independent caregivers.

Further, more than a month elapsed between the time debtor solicited Mayfield and the date the Hinmans finally terminated their agreement with Home Instead. They did not hire debtor immediately upon termination of her employment with Home Instead; they approached debtor over a month later. By that time, debtor had sought the advice of counsel. I believe she was avoiding soliciting business from Home Instead's current clients, based on counsel's advice that her contracts with Home Instead prohibited

Page 10 - MEMORANDUM OPINION

her from doing so.  She also questioned Rick Hinman to confirm that the Hinmans were no longer using Home Instead's services before she agreed to work for them.  Thus, I conclude that, with respect to the employment that began June 2, it was the Hinmans who contacted debtor and not the other way around.

I also find that, if debtor interfered with the contract, that interference was not intentional.

> If the person whose actions interfere does not have the intent to cause the result, his conduct does not subject him to liability. However, even if he does not act for the purpose of interfering or does not desire it but knows that the interference is substantially certain to occur from his action and is a necessary consequence thereof, his interference is intentional as contemplated by the rule.  Restatement (Second) of the Law of Torts § 766, comments (*h*) and (*j*).

Straube v. Larson, 287 Or. 357, 360-61 (1979).

The evidence at trial did not prove that debtor's intent in providing services to the Hinmans was to cause harm to Home Instead.  Nor could she had known that her actions were substantially certain to cause harm to Home Instead, because the Hinmans had already terminated their agreement with Home Instead when debtor agreed to work for them.  Debtor understood that there was no contract with which to interfere, and therefore could not have thought that a necessary consequence of her employment by the Hinmans would be harm to Home Instead.

Finally, Home Instead failed to prove that its damages are casually connected to debtor's interference with its relationship with the Hinmans.  Home Instead introduced evidence of the damages it suffered as a result of the Hinmans permanently canceling their contract.  However, it presented no evidence to show that the Hinmans would have likely

Page 11 - MEMORANDUM OPINION

reinstated its contract with Home Instead had debtor rejected the Hinmans' job offer. To the contrary, the Hinmans hired at least one other private caregiver even before they permanently canceled their contract with Home Instead. Additionally, when Rick Hinman canceled his parents' contract, he informed Home Instead that his parents could no longer afford their rates. This suggests that, regardless of debtor's actions, the Hinmans likely would have discontinued using the services of Home Instead. Home Instead did not present any evidence to the contrary. I find that Home Instead did not demonstrate that any damages it suffered were caused by debtor's alleged interference.

Because I conclude that Home Instead's proof fails on the first, second, and fifth elements of the tort of intentional interference, I need not consider whether the breach of a covenant not to compete could be an improper means that would support a claim for intentional interference with contract.

2. <u>Willful and Malicious Injury</u>:

Although my findings above are sufficient to support a decision in favor of debtor, I will also analyze whether debtor caused willful and malicious injury, because my conclusions provide an alternative basis for my determination that debtor should prevail. A debt may be excepted from discharge under § 526(a)(6) only to the extent that the injuries suffered were caused by conduct that was both willful and malicious. Willfulness and maliciousness are analyzed separately. In re Sicroff, 401 F.3d 1101, 1105 (9th Cir. 2005).

To be "considered willful, the debtor must commit an act akin to an intentional tort under state law, and the debtor must intend the

Page 12 - MEMORANDUM OPINION

consequences or injury resulting from that act rather than just the act itself." Geiger, 523 U.S. at 61-62.  In other words, the plaintiff must prove "either that the debtor had a subjective motive to inflict the injury *or* that the debtor believed that injury was substantially certain to occur as a result of [her] conduct."  Jercich, 238 F.3d at 1208 (emphasis in original).  See also In re Su, 290 F.3d 1140, 1144 (9th Cir. 2002).  In determining the defendant's state of mind, the court "may consider circumstantial evidence that tends to establish what the debtor must have actually known."  Su, 290 F.3d at 1146 n.6; Sicroff, 401 F.3d at 1106.

Home Instead argues that debtor was substantially certain that her employment by the Hinmans would result in the termination of the business relationship between the Hinmans and Home Instead and would thereby cause economic injury to Home Instead.  Home Instead's argument is predicated on the assumption that, by accepting employment with the Hinmans, debtor caused the Hinmans to terminate their contract with Home Instead.  I find this argument unconvincing because the assumption is wrong.

As I explained above, I believe the testimony that the Hinmans terminated their Home Instead contract before they called debtor and offered her employment.  Furthermore, debtor was aware that she was bound by the Non-Compete and Employment Agreements.  She sought the advice of an attorney to explain her rights and obligations under those contracts. Debtor followed the advice of her attorney and did not solicit employment from the Hinmans.  Debtor accepted Rick Hinman's job offer after he had terminated his parents' contract with Home Instead.  Home Instead presented no evidence showing that debtor's acceptance of employment had

Page 13 - MEMORANDUM OPINION

any effect on the Hinmans' decision to cancel their contract. As previously discussed, the Hinmans had already hired another independent caregiver and were canceling their contract for financial reasons. Debtor's conduct in causing injury to Home Instead, if any, was not willful.

A malicious injury is caused by "'(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'" Jercich, 238 F.3d at 1209 (quoting In re Bammer, 131 F.3d 788, 791 (9th Cir. 1997)). Home Instead argues that debtor's breach of her contractual obligations wrongfully and intentionally caused injury to Home Instead.

There are two problems with this argument. First, debtor did not *intentionally* breach her contract. Debtor relied in good faith on her attorney's advice that accepting employment from a former client was not a breach of her contracts. See In re Adeeb, 787 F.2d 1339, 1343 (9th Cir. 1986) (a debtor's intent to hinder or delay creditors may be vitiated by good faith reliance on the advice of counsel). There is nothing inherently wrongful about a person accepting employment offered by a former client. The contracts debtor signed did not expressly state that they prohibited employment by former clients. Debtor is not a sophisticated business person. Her training is as a hairdresser. Her earnings were not substantial - she earned a little over $10 per hour ($250 for a 24 hour shift) working for the Hinmans. Under these circumstances, it was reasonable for her to consult and follow the advice of an attorney when her former employer threatened her.

Debtor's contractual restrictions lasted only three months after

Page 14 - MEMORANDUM OPINION

termination of her employment, and more than one month had already elapsed when Rick Hinman contacted debtor. Given the short remaining duration of the restrictions, coupled with the fact that the debtor did not solicit work from Home Instead clients once she understood her obligations, I believe that debtor was trying to avoid violating her contractual obligations as she understood them. I find that the debtor lacked the intent necessary to maliciously injure Home Instead.

Second, I find that her conduct was not done "without excuse." In and of itself, competition is not inherently wrongful. Only the breach of the non-compete and non-solicitation provision can be considered wrongful. I have found that debtor reasonably relied on her attorney's interpretation that the contract language did not include "former clients." Whether or not I ultimately disagreed with that attorney's interpretation as to one of the contracts does not prevent debtor's reliance on his advice from being in "good faith" and providing an "excuse" for her conduct.

3.  Attorney Fees:

Both parties sought attorney fees in this adversary proceeding, relying on the attorney fee provision in the Non-Compete Agreement. The Non-Compete Agreement provides:

> If Employer shall *prevail* in a legal proceeding to remedy a breach or threatened breach of this Agreement, Employer shall be entitled to receive reasonable attorney's fees, expert witness fees, and out-of-pocket costs incurred in connection with such proceeding, in addition to any other relief it may be granted.

(emphasis added). ORS 20.096(1) effectively makes this provision reciprocal. It provides:

> In any action or suit in which a claim is made based on a contract, where such contract specifically provides that attorney fees and

Page 15 - MEMORANDUM OPINION

> costs incurred to enforce the provisions of the contract shall be awarded to one of the parties, the party that prevails on the claim, whether that party is the party specified in the contract or not, shall be entitled to reasonable attorney fees in addition to costs and disbursements.

Home Instead is not entitled to recover attorney fees from debtor because it did not prevail in this adversary proceeding. Debtor prevailed on this § 523(a)(6) claim because Home Instead failed to prove that she willfully and maliciously injured it. That does not mean, however, that debtor is entitled to recover attorney fees.

The extent to which a debtor who prevails in dischargeability litigation involving a contract that contains an attorney fee clause can recover attorney fees is unresolved because of the recent decision in Travelers Cas. & Surety Co. Of Am. v. Pac. Gas & Elec. Co., 127 S.Ct. 1199 (2007). In that case, the Supreme Court held that the Ninth Circuit had erroneously disallowed a creditor's contractual attorney fee claim on the basis that the legal work pertained strictly to federal bankruptcy law. The Ninth Circuit had earlier held that in dischargeability litigation, attorney fees could not be awarded for legal work related to dischargeability, because that is a question of federal law, not an action on the contract. But attorney fees could be awarded for legal work related to contract issues, if the dischargeability litigation involved enforceability of a contract that contained an attorney fee provision. In re Hashemi, 104 F.3d 1122, 1126-1127 (9th Cir. 1997); In re Baroff, 105 F.3d 439, 442 (9th Cir. 1997) (debtor awarded attorney fees in dischargeability litigation, because debtor successfully defended based on a settlement contract containing an attorney fee provision).

Page 16 - MEMORANDUM OPINION

I need not resolve in this case the extent to which Travelers has impacted recovery of attorney fees in dischargeability litigation, because I find that debtor breached the Non-Compete Agreement. The Non-Compete Agreement provided that debtor would not "solicit, divert or take away, or attempt to divert, solicit or take away, the business or patronage of any of the clients, customers or accounts, or prospective clients, customers or accounts" of Home Instead during her employment and for a "period of 3 months after termination." The contract covers current and "prospective" "clients, customers or accounts." The term "prospective" is extremely broad. It encompasses anyone who is a potential client, customer or account. There is nothing in the text or context that would exclude former clients. Someone may use professional services on a sporadic basis. Thus, former clients are within the universe of prospective clients. Because debtor breached her contract with Home Instead by providing services to the Hinmans within three months after she left her employment, she is not entitled to attorney fees under the Non-Compete Agreement. She prevailed in this litigation because the debt is dischargeable, not because she did not breach the contract.

The Employment Agreement, which is a separate contract, does not provide a right to attorney fees in the event enforcement or interpretation is necessary. Thus, debtor cannot be awarded attorney fees even if she did not breach the Employment Agreement.

## CONCLUSION

Debtor's conduct was not tortious, and did not cause willful and malicious injury to Home Instead. Consequently, the debt owed by debtor

Page 17 - MEMORANDUM OPINION

to plaintiff, if any, is dischargeable.  Both parties' requests for attorney fees are denied.

### 

cc: Milly Whatley
    Fred Kowolowski